Okay, the next case is number 14-1401, Samson Electronics Corporation against CCP Systems AG, Mr. McCullers. Thank you, Your Honors. May it please the Court, I plan to allocate six minutes to Samson's appeal and then reserve nine minutes of rebuttal time to respond to CCP's cross-appeal and our appeal. Okay. Your Honors, Claims 55 and 63, they are obvious over the Prior Art 705 patent. These claims, they recite a system that's adapted to send and receive emails in cases defined in the script. Although the Board did not contest the teaching of sending, the Board reversed the examiner on the teaching of receiving. And for the panel's reference, there's no question of combinability of the Prior Art or other issues. In other words, the sole issue is whether the Prior Art 705 patent teaches the claimed receiving. The Board's decision, overturning the examiner, this is reversible error. The Board's analysis, it just doesn't reconcile with the examiner's literal reading of the claim language onto the Prior Art. Let's talk about the 705 patent and how it works. There's no dispute as to what this patent teaches. There's an archiving server. It receives emails and places them in folders. There's a script that is associated with each folder. You don't see a distinction between a system that actively takes part in triggering the receipt of an email and a system that simply sits there and reacts to receipt of an email. Your Honor, yes, in this particular case, the system, the way the claim is recited, is a data processing unit that's programmed to receive emails in cases defined in the script. In this instance, we have a system where there is an email that is placed into a folder. In this case, a folder abc, it's ab.com as an example. In that abc directory, that email is unquestionably received. What happens is that triggers an event. When the email is placed in that folder, the triggering event is that the script goes and pulls that email and processes it. The script is actively invoked and in the cases defined in the script, it is receiving and processing that email because it is received in that designated folder. The script is actively pulling the email and acting upon it. With regard to that, there are the scripts. They are received and processed with respect to the particular folder. In cases defined in the script, it refers to the fact that there are scripts associated with a particular folder, abc, it's ab.com. When that script is invoked, the case defined in the script is that it goes and it pulls the email from that folder that it's designated. You'll agree that the triggering event is simply the receipt, right? The triggering event is pulling the email from the folder, abc, it's ab.com, the abc folder in that directory. When that email is deposited in that folder, the script goes and triggers and pulls the email from that folder and acts upon it. That is receipt in the case associated with that script. But the script acts after receipt of email, not the script itself doesn't trigger the receipt of email. The script triggers receiving the email because it is within the system, it is within the server and the script acts upon it by pulling it from the folder. The data processing unit, the claim is a data processing unit that is further programmed to receive emails in cases defined in the script. The board essentially found that a debt sort of collects properties of emails that are already stored, right? And that's a factual determination that the board made. Why don't we have to give some deference to that determination? Well, the idea that the script collects properties of the message, yes, but then the script parses the body of the message and extracts all the information. The collecting of the message is still, the script is invoking that. The script is actively collecting the properties of the message when it is pulling it from the folder, from the abc folder. The board has not given an explanation as to what that means. The board has said that it is receiving emails in cases defined in the script but then it doesn't explain why this reference doesn't meet that. Here, the analogy would be if I'm sending my federal circuit brief to the clerk's office, the fact that the panel also receives that brief doesn't change the fact that you, the panel, receive it. The fact that it went to the email, went to the clerk's office first, that doesn't change the fact that you, the panel, actually received my brief. So what's happening here is the script is going and pulling that email from the folder and acting upon it. So it is triggering the receipt of that email. CCP's only argument is that the fact that the script is activated later after the email is first received by the archiving server, but that argument is unpersuasive because it's ignoring the fact that we have this further receipt by the script. The fact that the server receives the email first, that's irrelevant. The script does receive the email and that's all that matters. Okay, thank you. Mr. McCombs, we'll save the rest of your time for rebuttal. Mr. Matsui. Thank you, Your Honor. May it please the Court, Brian Matsui on behalf of CCP Systems. The board should be reversed. I'd like to first focus on CCP's appeal. The board should be reversed because its decision turns on two overbroad and erroneous constructions of two key terms of the 789 patent, digital print data stream and printer. Once those erroneous constructions are set aside, the board's obviousness and anticipation rejections should be reversed. The board construed print data stream to read on data streams that cannot be printed without further formatting. Even under the broadest reasonable interpretation, that cannot be correct. It gives no meaning to the word print. It ignores claim language, is inconsistent with the specification, and is contrary to the very object of the invention. So your position is that the data stream must always be output to a printer? No, Your Honor. It does not always need to be output to a printer, but it needs to be formatted such that it can tell the printer what to do.  The only explanation the board gave for its overbroad construction was that the specification does not define this term. But that's not the right inquiry here. An express definition is not required to give meaning to a claim term. Here the word print is in the claim term digital print data stream. The entire invention is directed to a certain type of data streams, which is limited by the use of the word print. Your friend on the other side is going to argue that you don't read print out of the term because under the board's construction it includes PDL and non-PDL formats. PDLs and non-PDLs can both be print data streams. For example, Samsung cites a type of print data stream that's formatted for the control of a printer that's called SCS, and that's not a PDL format. And that's actually one of the types of print data streams that the IBM reference recites. So the fact that print data streams do not need to be limited only to PDLs, but the fact of the matter is that the specification teaches at column one, line seven, that virtually all output devices, which are common today, use page description languages. And the specification teaches that page description languages are of a format to control a printer. For example, at column two, line 52, it states printing systems are still controlled by page description language, PDL, such as PCL, PostScript, and Prescribe. And the specification makes clear that when the patent is referring to a digital print data stream, it's referring to a format that is print capable, that is able to control a printer. For example, at column two again, line 62, the specification is teaching that the inventive method can take in a print data stream that's a PDL and transform it. It says, it is therefore an object of the present invention to specify a method for the transformation of digital print data streams, which is both capable of recognizing more complex page description languages whose syntax may no longer be described with the aid of simple regular expressions, and also provides the preconditions that the recognized graphic objects can be transformed into the target format. So the specification... So it's the format that you're concerned about, so that the... It's the format that would allow the printing, correct? Well, yes. All PDLs and all print data streams are in a format for a printer. And I think that if we look at the specification at line... At column one, around line 13, the specification explains that a driver will convert the objects into a PDL suitable for printer use, so that the latter can be hereby controlled directly. And so, when the specification and the patent are using the word print in print data stream, they're not saying it can be any sort of data stream that can be further manipulated. They're saying it's a data stream that is output from a host computer and would go to a printer and then ordinarily would be printed. Now, I think it's important to take a step back and see how this is relevant to the object of the invention. Because the whole point of the invention is to take that print data stream that leaves the host computer and then to manipulate it further. So, using some prior art printing methods, a user might sit at a computer and might have a database program and type and want to create an invoice. So, he might type in the customer name, the amount of sales, things like that. That's formatted by the database program and is sent out as a print data stream to a printer. And it will print usually on a pre-printed invoice form. And hopefully, the print data that goes from the host computer to the printer will align right and everything will be in the right places. What the inventive method does is it allows the user to use that same database program and type in the same information and hit print and send a print data stream. But then the inventive method takes over. It parses that print data stream for graphically representable objects, text and images, saves those objects into memory and then assigns scripts to them. So, what happens is, for example, the customer name would be an object and a script might be assigned to it and find out whether or not that customer owes more money, for example, or what type of form the invoice needs to be printed in. And those scripts then will format the data, will put them back into a format to control the printer and combine it into a print data stream and output to a printer. If we ultimately agree with you on claim construction, where exactly does that leave us? Well, then the board's decision should be reversed on all the anticipation and obvious rejections. Digital print data stream was a key term with respect to the rejection. You can see, though, that even under your construction, IBM would disclose a digital print data stream, aren't you? IBM disclosed... Would you seriously dispute that it would... It does have a digital print data stream, but IBM does not at all parse a digital print data stream for objects. Right, but what if we believe we have to defer to the board's conclusion that Interlink shows a parser? That's a list interpreter, essentially. Well, I think that the ordinary course, if there's a new claim construction, would be to remand here because the entire analysis would have been infected by that overbroad construction. Because Interlink no longer has a digital print data stream because it's just a document file stream. I mean, Interlink is a document editing program like Microsoft Word. Once you have the correct construction, there would be no motivation and no reason to combine any of Interlink's aspects to IBM. IBM here is just a 400-page manual for a printing subset system of an actual... So, essentially, they would have to do a motivation to combine analysis that they never got to because they never put together these two possibilities of Interlink teaching the parsing and your claim construction. That's correct. That's one of the problems with it. But the other fact is that there's no manipulation in IBM to a digital print data stream. I think that Samsung was going to point to figure 116 of IBM, and that's at... So, you're not conceding that IBM would show a print data stream? It would show a print data stream, but only in the traditional method. So, if we look at A418, there's a traditional print methodology, and there would be a print data stream in that top row that goes from the application to the printer, but there's no manipulation there. With respect to the second figure, AFP page definition, form definition, there is no print data stream. It's just unformatted data. It says it right there on the figure. So, the only type of manipulation that occurs there is not to a print data stream. So, you're saying you would have some additional arguments that, putting aside that issue of interlinks and motivation to combine, that there's something else about IBM that's not fully taught. We would have a number of arguments. Yes. I mean, another example is the board relied upon the combination of IBM and Interleaf's print scripting process. It's not clear what print scripting is. It's not found anywhere in those references. Print scripting only probably came about because the examiner had that overbroad construction of digital print data streams, such that the document file stream was a print data stream. So, all that analysis would have to be redone before the board, once you have the correct construction. I'd like to turn to the printer claim, if I could. No. Unless you have any other questions. Claim 20 was also rejected by the board, and the board held that a stand-alone printer connected, a stand-alone computer connected to a printer practiced Claim 20. And Claim 20 says, a printer characterized that it has a system for the transformation of a digital print data stream. That claim language, I would submit, makes clear that the printer actually has to have the system incorporated to it. It just can't be connected to a computer. But, more importantly, that's made even more explicit by the specification. Because the specification says, well, to take a step back, Claim 20 is directed to a printer. Claim 21 is directed to a print server that's characterized, that has a system for the transformation of a digital print data stream. Both those claims are in the specification. It says at column 8, line 24, the system, according to the invention, can also be integrated into a printer, which would be Claim 20, or else a print server, which would be Claim 21. So, the Board's construction of printer, that it could just be a computer attached to a printer, can't be correct. Unless the Board has any further questions, I'd like to save my time. Okay. Mr. McCombs. Your Honors, CCP's cross appeal, it rests on this Court adopting its claim construction of print data stream. But let's step back and look at how we got here. This is reexamination, where CCP had the opportunity to amend its claims. And CCP did so in many respects, but it did not do so with respect to this issue. Instead, CCP is now asking the Court to read in limitations that it was not willing to make express in the claims. Its construction of print data stream, it has two fundamental problems. The idea here that the print stream must be in a format to control a printer before it's read in. The first and most fundamental error here is that CCP is imposing a limitation that's just not stated in the claims. The claims recite both input print streams and output print streams. The input print stream, that's not specified to be in a format for control of a printer. The output stream, though, is specifically recited to be in a format for control of a printer. So, thus we see we have one and only one of the two print streams being formatted for control of a printer. One and only one. But, I mean, aren't you really just calling them data streams and forgetting about the point that print modifies this phrase? No, Your Honor. Print is given meaning because the print stream is capable of being printed. It's capable of being transformed for printing. The output stream is formatted for control of a printer. The input stream, it's the concept here that it is printable. It doesn't include just any stream. It couldn't be, for example, a music stream or Ethernet packets. It's a stream that can be transformed by the claim process for printing. A print stream is simply a data stream that is transformed and may be output to a printer. The claim language does not explicitly require more than that. I'm having a hard time because neither the Board nor the examiner really explained how they got to this claim construction. It's one thing to say that we give a lot of deference to the Board's analysis, but the Board really didn't do any analysis here. You're substituting your analysis for the Board's analysis. Your Honors, I think that in the context here that the Board's analysis and the underlying examiner's analysis makes perfect sense because what we're looking at is what does the claim language say. The fact that the output stream may be formatted for control of an output device, preferably a printer. The fact that there is a transformation process going on so that it can be converted for print control itself suggests that the stream that is being read in is something that is going to be printable. I think that that analysis is correct. The idea here that the way the claim language is worded, if the patent owner wanted to make express that it needed to be in a print control format before it was read in, that could have been done easily throughout the course of this reexamination. That was raised very early on in this reexamination process. The claim doesn't require that limitation. The second fundamental error that is a problem here with this construction is that it simply just contradicts the specification. CPP's construction, it excludes two embodiments in the specification in which the input stream is an XML document or HTML. I don't understand how you justify calling those print formats. These are formats that are not already in a format for print control but Column 2, if you look at the upper portion of Column 2, it is specifically referring to these as formats that are to be, they're input formats to be recognized and converted. For the smart printer or intelligent printer to pull down and to use to update the objects once they're parsed, right? Well, the argument that XML can be used as input for a script, that's discussed in the patent, but that doesn't negate the Column 2 teaching of XML as an input print stream. And if we go to Column 2 at line 21, it refers specifically to this as a print data stream which is clearly referring to XML in the prior paragraph and the fact that XML is an input that is to be recognized and converted for printing. In the context of that portion of Column 2, it is clear that that's the case, that it is a format that is to be converted for printing. Now, this then brings us to the prior art references themselves and if the board's construction is affirmed, CCP has conceded obviousness. CCP's position here is that IBM's Figure 116, which is in the record of A418, that that parses unformatted input print data. In their reply brief at page 21, they're admitting that IBM has a teaching of an input print stream and parsing under the board's construction. Well, the board didn't agree that IBM showed parsing, did it? Yes, it did at page 11. I thought the board relied on Interleaf for the parsing. It relied on Interleaf for teaching the scripts, but what was shown was that in IBM, you have an input print stream that is parsed and then there was the combination with the use of the Interleaf scripts. In IBM's Figure 116, the argument was that that doesn't teach parsing of SCS, which is Signature Character String SCS, which is a format that is a format for print control. What was being argued by the patent owner was that in that figure, SCS was not being parsed by IBM because SCS was only input to the upper portion of that figure and the lower portion of that figure, the argument was that that would only parse unformatted inputs, but that was not bought by the examiner. I think you're confusing the examiner and the board. The board specifically rejected IBM under 102. It rejected IBM under 102 for the purposes of scripts. It did combine the Interleaf scripts with the IBM parsing. With respect to that, there was no issue of the combinability of those two references. The analogous nature of those references was made clear because they both address object-oriented publishing with scripting functionality and as well, the analogous nature of these references did not hinge on the idea of printing. It was the idea of assigning scripts to be printed, to be executed. Just to address, Your Honor, Claim 20. With regard to Claim 20, the board correctly found that a printer having a transformation system is obvious. It's known to have a server that is directly connected by a cable to a printer. That's what the IBM reference shows. What CCP is saying is that they have a patentable claim because they're able to wrap a box around that and make it a single chassis. But this box drawing, that was properly rejected. What the purported novelty was was the transformation method, not where you put that. And the patent recognized this in the background in saying that it was known to put control processing functionality onto a printer. That's in the patent at column 1, line 17, and at column 2, line 44. So in that respect, the board got that right. Okay. Thank you, Mr. McCombs. Let's hear from the jury. A few minutes. Thank you, Your Honor. First of all, we did not need to amend our claims at any point during the reexamination on this point for the claim construction because the word print is used throughout our claims. It's in the title of our patent. It's used throughout the specification. When the patent uses the word print, it's clearly limiting the data stream that it's referring to to a print data stream, one that's capable of telling a printer what to do in a format to control a printer. Second, the references to XML and HTML are not print data streams. They are referred to at column 2 as other input formats. And as the patent makes clear, Judge O'Malley, as you were mentioning, those other input formats come into play after the input print data stream has been parsed for objects and then scripts have been assigned. At that point, those other input formats can be brought in through the scripts assigned to objects and they can be transformed. And then after that, the object can be put back into a format to control a printer and output as a print data stream. So XML and HTML are nowhere referred to as a print data stream. The type of data stream that's a print data stream is one that's already in the format to control a printer. And finally, just with respect to IBM, IBM does not disclose any parsing of a print data stream. The board rejected the anticipation rejection based upon IBM because it did not have the inventive method. Once there's a new claim construction, there's no way to combine Interleaf and IBM. There's no parsing of a print data stream. There's no such thing as print scripting in Interleaf. So the board's decision should be reversed. Okay. Thank you, Mr. Mitsui. The case is taken under submission.